**MISSOURI PACIFIC RAILROAD COMPANY, Plaintiff,**

v.

**55 ACRES OF LAND LOCATED IN CRITTENDEN COUNTY, ARKANSAS; Frances R. Wallace; and Unknown Owners, Defendants.**

No. J–C–96–254.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

Nov. 4, 1996.

John Dewey Waton, Friday, Eldredge & Clark, Little Rock, AK, for plaintiff.

Elton Rieves, III, Elton Rieves, III, Rieves & Mayton, West Memphis, AK, for defendants.

## ORDER

STEPHEN M. REASONER, Chief Judge.

Pending before the Court is the defendant's Motion for Relief from Order of Possession. The Court held a hearing regarding this matter on September 23, 1996. Based upon the pleadings filed herein, as well as the testimony and arguments of counsel presented at the hearing, the Motion is denied.

### I. FACTUAL BACKGROUND

Plaintiff, Missouri Pacific Railroad [hereinafter "MoPac"], is a corporation incorporated under the laws of the State of Delaware. Its principal place of business is located in the State of Nebraska. On August 1, 1996, it filed the present action in federal district court for the condemnation of certain lands located in Crittenden County, Arkansas. The basis of subject matter jurisdiction asserted by MoPac is that of diversity of citizenship pursuant to 28 U.S.C. § 1332. The defendant landowner, Frances R. Wallace, is a citizen of Crittenden County, Arkansas.

Ms. Wallace filed a Motion to Dismiss and Answer. In her motion, the defendant raised various defenses to the proposed taking. Among these were: (1) that the Court lacked subject matter jurisdiction; (2) that MoPac failed to file suit in the circuit court of the county in which the land is located, as required by Arkansas statute; (3) that the

proposed taking of property for an intermodal facility does not fall within the meaning of "right-of-way" for which a railroad may exercise its power of eminent domain; (4) that MoPac does not intend to construct an intermodal facility on the land it is attempting to condemn; (5) that the subject land is zoned "residential" by the City of Marion and cannot be used by MoPac for the purpose of constructing an intermodal facility; (6) that MoPac acquired land in 1993 located approximately five miles from defendant's property which it could utilize for the construction of the intermodal facility; and (7) that irreparable harm would result if the Court were to sign an order of condemnation because there is an existing crop growing on the land.

Because other condemnation cases filed by MoPac in this Court involve identical issues to those presented here, the Court allowed the parties involved in the other cases to present arguments and testimony at the September 23, 1996 hearing. Additional objections to the taking have been raised by these parties in their pleadings. For simplification, these issues will be added to those designated above. These additional defenses are: (8) that MoPac has failed to join indispensable parties, namely, a tenant farmer and the City of Marion; and (9) that the taking is private and not "necessary" to MoPac's operations. After discussing the factual history of this case, the Court will address these nine defenses in the order by which they are numbered.

On August 23, 1996, after reviewing the complaint and motion to dismiss filed in this case, the Court entered an Order of Possession granting MoPac the "right of immediate entry onto and possession of the Property." Further, the Order stated that "the Defendants ... be and are hereby required and directed to immediately surrender possession of said Property to MoPac." MoPac was allowed to "have entry upon the lands for all purposes, including surveying the Property to determine its exact description and preparing the site for construction and constructing the proposed intermodal facility." This Order prompted the filing of the subject Motion for Relief and a lengthy hearing on this matter.

MoPac seeks to condemn the subject lands for the construction and operation of an "intermodal facility". Testimony presented at the September 23rd hearing revealed that an intermodal facility allows for trailers and containers loaded with freight to be transferred from train to train, truck to train, or train to truck. According to MoPac, the intermodal facility "will allow for more efficient transportation of goods and freight by customers of MoPac and other railroad companies in order to better facilitate the shipment of goods and freight in interstate commerce. See Complaint, ¶ 6. MoPac argues that its proposed intermodal facility must be able to accommodate at least a 7,000 foot long train. Therefore, subsequent to the filing of the present action, it instituted five additional condemnation actions in this Court. The asserted basis of jurisdiction in all is that of diversity of citizenship. In total, MoPac seeks to condemn over 544 acres from landowners in Crittenden County.

As a preliminary matter, MoPac argues that Federal Rule of Civil Procedure 71A prevents the Court from even considering the defenses raised in the Motion to Dismiss and Answer. Rule 71A sets forth a detailed procedure for condemnation actions brought in federal district court and provides, in part:

If a defendant has any objection or defense to the taking of the property, the defendant shall serve an answer within 20 days after the service of notice upon the defendant. The answer shall identify the property in which the defendant claims to have an interest, state the nature and extent of the interest claimed, and state all the defendant's objections and defenses to the taking of the property. A defendant waives all defenses and objections not so presented, but at the trial of the issue of just compensation, whether or not the defendant has previously appeared or answered, the defendant may present evidence as to the amount of compensation to be paid for the property, and the defendant may share in the distribution of the award. No other pleading or motion as-

serting any additional defense or objection shall be allowed.

FED.R.CIV.P. 71A(e).

■ MoPac argues that because the defendant's pleading was entitled "Motion to Dismiss and Answer", it should not be considered by the Court. The Court rejects such a restrictive reading of Rule 71A. First, one of the issues raised in the pleading addresses subject matter jurisdiction. This is an issue which the Court could raise *sua sponte* at any time during the proceedings. *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939). Thus, the Court is not prevented from considering this issue. Additionally, the pleading filed by the defendant was entitled "Motion to Dismiss and Answer". In that pleading, the defendant raised objections to the proposed taking. While the pleading may have been more properly styled as an "Answer and Objections to Taking", the defendants have substantially complied with the spirit of Rule 71A. The purpose of the Rule is to simplify condemnation proceedings in federal court and to clarify the issue of what state procedures apply. *Northern Border Pipeline Co. v. 127.79 Acres of Land, More or Less in Williams County, North Dakota*, 520 F.Supp. 170, 171 (D.N.D.1981). Its purpose is not to prevent the Court from considering meritorious defenses to the exercise of eminent domain power. The Court will now turn to addressing each of the nine defenses raised by the defendants.

## II. DEFENSES TO THE PROPOSED TAKING

### 1. Lack of Subject Matter Jurisdiction

Defendants argue that this Court lacks subject matter jurisdiction under the diversity statute, 28 U.S.C. § 1332. They concede that MoPac is a corporation incorporated under the laws of the State of Delaware and has its principal place of business in the State of Nebraska. All defendants are Arkansas citizens. However, the landowners argue that because MoPac filed its Articles of Incorporation with the Arkansas Secretary of State pursuant to Arkansas Code Annotated Section 23–3–108, it is also deemed to be a citizen of Arkansas for diversity purposes.

Arkansas Code Annotated Section 23–3–108 provides:

(a)(1) Before any railroad ... of any other state or territory organized for the purpose of generating, transmitting, and distributing electric power and energy for public use shall be permitted to avail itself of the benefits of §§ 23–3–108, 23–11–302, 23–11–401, 23–11–402, and 23–11–404 or any part thereof, the corporation shall file with the Secretary of State of this state a certified copy of its articles of incorporation if incorporated under a general law of the state or territory....

(2) Upon the filing of its articles of incorporation ... with a map and profile of the proposed line and payment of the fees prescribed by law for railroad ... charters, ... the railroad, ... for all intents and purposes, shall become a railroad ... of this state, subject to all the laws of this state, the same as if it was formally incorporated in this state, anything in its articles of incorporation or charter to the contrary notwithstanding.

(3) Such acts on the part of the corporation shall be conclusive evidence of the intent of the corporation to create and become a domestic corporation.

Ark.Code Ann. § 23–3–108 (Michie 1987). There is no dispute that MoPac did, in fact, file copies of its articles of incorporation with the Arkansas Secretary of State on August 21, 1978. *See* Certificate of Good Standing of a Foreign Corporation attached as Exhibit "A" to MoPac's Brief in Support of Response to Motion to Dismiss.

As set forth in Section 23–3–108, by virtue of filing its articles in this state, MoPac was allowed to sell or lease roads or property to connecting foreign railroads and was given the power to acquire other railroads. Ark. Code Ann. § 23–22–302. Secondly, it was authorized to extend and construct its railroad into or through this state. Ark.Code Ann. § 23–22–401. Thirdly, MoPac was permitted to buy, lease, or otherwise acquire any railroad in this state. Ark.Code Ann. § 23–11–402. Finally, it was subject to taxation by the state or counties through which

its roads might be located. Ark.Code Ann. § 23–22–404. This Court must decide what effect, if any, compliance with this state statute has on federal court jurisdiction over a corporation under 28 U.S.C. § 1332.

As pointed out by Professor Moore in his treatise on federal practice, "[c]ourts consistently and properly distinguish[ ] between three situations: (1) a corporation's being licensed to do business or domesticated in a second state; (2) a corporation's incorporation by compulsion in a second state; and (3) a corporation's voluntary reincorporation in a second state." 1 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.78[1.–2] (2d ed. 1985). Professor Moore notes that "[a]lthough the corporation may have rights and obligations under the laws of the second state in all three of these situations, courts treat only the third as creating a second corporation for purposes of diversity of citizenship jurisdiction. Thus, in either of the first two situations, the corporation is treated as incorporated in its original state of incorporation only." *Id.*

Professors Wright and Miller are in agreement with the pronouncement contained in Moore's Federal Practice. Accordingly, they state, "[t]he general rule is that if the corporation merely is licensed to do business or is denominated a domestic corporation in the second state, but the relevant legislation of that state requires *less than local incorporation,* it does not become a citizen of the second state for diversity purposes." 13B CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3623 (2d ed. 1987) (emphasis added).

In the present case, MoPac was not required to reorganize in the State of Arkansas. Rather, it was merely required to file copies of its articles of incorporation with the Arkansas Secretary of State. The Arkansas statute at issue is entitled "Domestication of foreign railroad, pipeline, or electric light and power corporations." According to Black's Law Dictionary, to become "domesticated" means to be "[m]ade domestic or converted to domestic use." BLACK'S LAW DICTIONARY 484 (6th ed. 1991). Conversely, "incorporation" means "[t]he act or process of forming or creating a corporation." *Id.* at 766.

MoPac did not incorporate in Arkansas. Rather, it was merely domesticated to avail itself of the rights and privileges of Arkansas corporations. By doing so, it did not forfeit its right to resort to federal court jurisdiction in matters involving Arkansas citizens.

It has been said that the determination of whether a corporation has incorporated or is merely domesticated or licensed to do business depends upon the legislative intention of the state concerned. *Carolina & Northwestern Ry. Co. v. Town of Clover,* 34 F.2d 480 (W.D.S.C.1929), *appeal dismissed,* 42 F.2d 1021 (4th Cir.1929). Happily, the effect of Section 23–3–108 upon federal court diversity jurisdiction was addressed by the United States Supreme Court in *St. Louis & San Francisco Ry. Co. v. James,* 161 U.S. 545, 16 S.Ct. 621, 40 L.Ed. 802 (1896). The issue addressed in *James* was whether compliance with the Arkansas domestication statute (then Acts 1889, No. 34, § 2, p. 34) caused a railroad incorporated under the laws of Missouri to cease to be a citizen of Missouri, so as to render it subject to suit in federal district court by a Missouri citizen. Thus, the issue in *James* was whether the domesticated corporation lost its Missouri citizenship. The Court held that it did not. *Id.* at 566, 16 S.Ct. at 629.

In making its determination in *James,* however, the Supreme Court was forced to ascertain the legislative intent behind what is now Arkansas Code Annotated Section 23–3–108. In doing so, the Court stated:

[W]hatever may be the effect of such legislation, in the way of subjecting foreign railroad companies to control and regulation by the local laws of Arkansas, we cannot concede that it availed to create an Arkansas corporation out of a foreign corporation in such a sense as to make it a citizen of Arkansas within the meaning of the federal constitution, so as to subject it to a suit by a citizen of the state of its origin. In order to bring such an artificial body as a corporation within the spirit and letter of that constitution, as construed by the decisions of this court, it would be necessary to create it out of natural per-

sons, whose citizenship of the state creating it could be imputed to the corporation itself.

*Id.* at 565, 16 S.Ct. at 628. Thus, the intent of the Arkansas Legislature in enacting Section 23–3–108 was that a foreign corporation would merely become domesticated, as opposed to being reincorporated in this state. *Compare Memphis & Charleston Ry. Co. v. Alabama,* 107 U.S. 581, 2 S.Ct. 432, 27 L.Ed. 518 (1883) (holding that Tennessee railroad became an Alabama citizen upon compliance with Alabama domestication statutes which required corporation to open books in Alabama for the subscription of stock in the corporation and required that directors be elected in the State of Alabama).

In a case factually similar to the one at bar, the United States Supreme Court stated:

> So it seems that a corporation may be made what is termed a domestic corporation, or in form a domestic corporation, of a state in compliance with the legislation thereof, by filing a copy of its charter and bylaws with the secretary of state; yet such facts do not affect the character of the original corporation. It does not thereby become a citizen of the state in which a copy of its charter is filed, so far as to affect the jurisdiction of the Federal courts upon a question of diverse citizenship.

*Southern Ry. Co. v. Allison,* 190 U.S. 326, 337, 23 S.Ct. 713, 717, 47 L.Ed. 1078 (1903). At issue in *Allison* was whether a corporation incorporated under the laws of Virginia became a citizen of North Carolina by complying with the North Carolina domestication statute. *Id.* at 331, 23 S.Ct. at 715.

The North Carolina statute provided that a railroad company incorporated under the laws of any state, other than North Carolina, which desired to own property or carry on business in North Carolina had to become a domestic corporation of that state by filing a copy of its charter and bylaws with the North Carolina Secretary of State. *Id.* The effect of such action by a corporation caused it to "enjoy the rights and privileges, and be subject to the liability, of corporations of this state the same as if such corporation has

been originally created by the laws of this state." *Id.* The Supreme Court held that, notwithstanding the language of the statute, the railroad was not a citizen of North Carolina. Thus, it could properly remove an action filed in state court by a citizen of North Carolina to federal district court. *Id.* at 339, 23 S.Ct. at 718.

 Based upon these authorities, the Court finds that the Arkansas statute at issue is merely a domestication statute and that it does not render MoPac a citizen of Arkansas for purposes of federal court diversity jurisdiction. That being the case, however, defendants contend that MoPac is prevented from exercising its power of eminent domain in this state by the Arkansas Constitution. More particularly, they argue that Article 12, Section 11 of the Arkansas Constitution prohibits a foreign corporation from condemning private property. That constitutional provision states:

> Foreign corporations may be authorized to do business in this state under such limitations and restrictions as may be prescribed by law. Provided that no such corporation shall do any business in this state except while it maintains therein one or more known places of business and an authorized agent or agents in the same upon whom process may be served; and, as to contracts made or business done in this state, they shall be subject to the same regulations, limitations and liabilities as like corporations of this state, and shall exercise no other or greater powers, privileges or franchises than may be exercised by like corporations of this state, *nor shall they have power to condemn or appropriate private property.*

Ark. Const. Art. 12, § 11 (emphasis added).

Defendants, however, fail to recognize the distinction between a purely foreign corporation, which the Arkansas Constitution clearly prohibits from exercising the power of eminent domain, and a domesticated foreign corporation, which may constitutionally exercise such power. The distinction was clearly pointed out by the Arkansas Supreme Court in *Russell v. St. Louis Southwestern Ry. Co.,* 71 Ark. 451, 75 S.W. 725 (1903). In *Russell,*

the plaintiff, a Missouri corporation, brought an action for condemnation of certain land in Arkansas. The defendants argued that the railroad could not condemn their land because it was a foreign corporation. The Arkansas Supreme Court rejected this argument. The court expressly held that upon compliance with the Arkansas domestication statute, a foreign corporation became a domestic corporation and was empowered to exercise the right of eminent domain.

■ Defendants argue that *Russell* is inconsistent with *James*. At first blush, the Court acknowledges that this appears to be the case. However, upon closer scrutiny, the cases are consistent with one another. This is because state court decisions are not conclusive on questions of federal court jurisdiction. *See, e.g., Missouri Pac. Ry. Co. v. Castle*, 224 U.S. 541, 32 S.Ct. 606, 56 L.Ed. 875 (1912). Thus, it is entirely plausible that a corporation could be foreign for purposes of diversity jurisdiction in federal court, yet be treated as domestic, and therefore, capable of exercising the power of eminent domain, under state law. The holding of *Russell* was reaffirmed by the Arkansas Supreme Court in *Gregory v. Oklahoma Mississippi River Prod. Line, Inc.*, 223 Ark. 668, 267 S.W.2d 953 (1954). In *Gregory*, the condemnor plaintiff, a Delaware pipe-line corporation, had previously domesticated itself pursuant to Arkansas statute. In that case, the court held that a corporation which takes the necessary steps to become a domestic corporation is no longer foreign in so far as it seeks to exercise the power of eminent domain. Although *Gregory* involved a different statute, the reasoning employed by the Arkansas Supreme Court is applicable to the case at bar. Thus, the Court concludes that MoPac is not prohibited from condemning land under the Arkansas Constitution.

### 2. Failure to File Suit in the Circuit Court of the County in Which the Land is Located

■ The landowners' next defense to the proposed taking is that MoPac did not follow Arkansas statutory law which requires that the condemning party file suit in the circuit court in the county in which the land is located. In this case, defendants argue that MoPac was required to file suit in Crittenden County Circuit Court if they wished to condemn the property. The statute at issue is Arkansas Code Annotated Section 18–15–1202.

■ MoPac argues that Section 18–15–1202 is merely a venue statute, and that it is not required to comply with that statute when exercising its power of eminent domain in federal district court. The Court agrees. If such were the case, a foreign corporation would be deprived of its right to resort to the federal courts when such courts would otherwise have proper jurisdiction. This, a state may not do. *Chicago & N.W. Railway Co. v. Whitton's Adm'r*, 80 U.S. 270, 20 L.Ed. 571 (1871).

The issue presented here is similar to that raised in *Mullen v. Academy Life Ins. Co.*, 705 F.2d 971 (8th Cir.1983). In *Mullen*, plaintiffs filed suit for valuation of their holdings of minority shares in a corporation incorporated under the laws of New Jersey. The New Jersey statute at issue provided that such suits were to be brought in the New Jersey Superior Court. Defendant argued that state law barred the plaintiff filing suit in federal district court. The Eighth Circuit Court of Appeals held that the New Jersey statute governed venue of the proceedings only and could not be construed as limiting federal district court diversity jurisdiction. In doing so, it stated:

> Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation.

*Id.* at 975 (quoting *Railway Co. v. Whitton's Adm'r, supra*). *See also, Greyhound Lines, Inc. v. Lexington State Bank and Trust Co.*, 604 F.2d 1151 (8th Cir.1979) (holding that Nebraska statute placing exclusive jurisdiction in county courts over tort claims against Nebraska decedents did not act as restriction or abrogation of a federal court's diversity jurisdiction over such claims).

The issue presented in the case at bar is factually indistinguishable from that presented in *Chicago, Rock Island & Pac. Ry. Co. v. Ten Parcels of Real Estate Located in Madison County, Iowa,* 159 F.Supp. 140 (S.D.Iowa 1958). In that case, the condemnor railroad filed suit in federal district court against landowners in the State of Iowa. The railroad sought to condemn the defendants' property pursuant to Iowa statutes. The landowners argued that the state statutes decreed mandatory conditions which were attached to the right of condemnation. They claimed that, if the railway was to condemn under the Iowa law, it must follow the Iowa statutory proceedings strictly. Those statutes provided for the appointment of a commission of six freeholders of the county to assess damages and generally laid out the duties and further procedures of the commissioners. Defendants interpreted this to mean that if the railway company sought to condemn under Iowa law, it must be limited to following the specific procedure set out by the Iowa statutes.

The Iowa court rejected this argument noting that "it is of course fundamental that no state statute can confer jurisdiction upon a Federal court, and equally fundamental that the mere procedural statutes of a state may not limit the jurisdiction conferred on Federal courts by the Constitution and Laws of the United States." *Id.* at 142. So too, this Court must reject the defendants argument in the present case. This is because an action to condemn land is a civil action within the meaning of Section 1332 and may be brought in the federal court of the district in which the land lies. *Boom Co. v. Patterson,* 98 U.S. 403, 25 L.Ed. 206 (1878). To hold otherwise would have the effect of amending Section 1332 by inserting the caveat that district courts shall have original jurisdiction of all civil suits "except those involving the exercise of the power of eminent domain."

*See Chicago Rock Island and Pac. Ry. Co.,* 159 F.Supp. at 143.[1] Therefore, the Court finds that the Arkansas statute providing that condemnation actions be brought in the Circuit Court for the county in which the land is located does not bar the present action.

### 3. Failure to Condemn for a "Right of Way" as Defined in Arkansas Code Annotated Section 18–15–1201

Defendants next argue that MoPac's proposed use of the land, i.e., as an intermodal facility, is not within the statutory definition of "right of way" contained in Arkansas Code Annotated Section 18–15–1201. Section 18–15–1201 allows a railroad to condemn private property for its right of way. Further, it defines "right of way" as "all grounds necessary for side tracks, turn-outs, depots, workshops, water stations, and other necessary buildings." Defendants argue that since the phrase "intermodal facility" is not within this list of uses, MoPac may not exercise its eminent domain power for such a purpose.

The Court notes at the outset that "a railroad right of way is a very substantial thing." *Mellon v. Southern Pac. Transp. Co, et al.,* 750 F.Supp. 226, 230 (W.D.Tex.1990). Arkansas law does not reveal any cases factually on point regarding what constitutes a "right of way" for railroad condemnation purposes. However, two cases provide substantial insight on the issue.

The first case was decided by the Arkansas Supreme Court in 1900. *St. Louis, Iron Mountain & Southern Ry. Co. v. Miller County,* 67 Ark. 498, 55 S.W. 926 (1900). In the *Iron Mountain* case, a petition was filed by a railway company in the Miller County Court asking that court to set aside and declare void an assessment of certain land owned by the company in the city of Texar-

---

1. Indeed, if state procedural law regarding the power of eminent domain prevented the subject suit, what would be the purpose of Federal Rule of Civil Procedure 71A(k)? That provision states: The practice as herein prescribed governs in actions involving the exercise of the power of eminent domain under the law of a state, provided that if the state law makes provision for trial of any issue by jury, or for trial of the issue of compensation by jury or commission or both, that provision shall be followed. FED.R.CIV.P. 71A(k). Clearly, the intent behind Rule 71A was to "afford[ ] a uniform procedure for ... cases invoking a state's power of eminent domain; and supplant[ ] all statutes prescribing a different procedure." *See* Original Report, FED. R.CIV.P. 71A(k).

kana. Pursuant to state law, only the board of railroad commissioners could assess the railway line and its right of way for tax purposes. All other property owned by a railroad was subject to taxation by county assessors. The County Assessor for Miller County attempted to tax the railroad's stock yards. The court held that the stock yards were properly within the meaning of "right of way" and thus, subject to taxation only by the board of railroad commissioners. The court found that the stock yards were used in the operation of the railroad, and were necessary to the proper shipment and handling of live stock. In doing so, it stated:

> A stock yard is in fact a depot for the reception of a peculiar class of freight, and is a part of the right of way, under the statute [now Arkansas Code Annotated Section 18–15–1201] above quoted, which provides that the words 'right of way' shall include all grounds necessary for depots and other necessary buildings.

*Id.* at 502, 55 S.W. 926.

The second case of import dealing with the Arkansas right of way statute is *Arkansas Cent. R.R. Co. v. Smith,* 71 Ark. 189, 71 S.W. 947 (1903). In the *Arkansas Central* case, land was conveyed to a railroad company in consideration of a depot at a certain location. The railroad established a side track and usual stopping place there, but erected no building for the protection and convenience of passengers and shippers. The grantor brought suit to recover the land alleging that the railway had failed to erect the depot as required in the deed.

The court found that the land should be reconveyed to the plaintiff because the railroad had, in fact, failed to erect a depot. The *Arkansas Central* case, however, is easily distinguished from the facts of the present case. The court found that the railroad had not built any structure for the protection of freight or passengers. Thus, the court stated:

> [T]he term "depot" may mean one thing or another, under different circumstances. It may mean a house for the storage of freight and the accommodation of passengers, or it may mean a place where railroad trains regularly come to a stop for the

convenience of passengers and for the purpose of receiving and discharging freight, or may include all of these things. Its meaning must be determined in each instance from the contract and the circumstances under which it is used.

*Id.* at 190–91, 71 S.W. 947. Further, the court noted that "[t]he term 'depot' usually includes not only the idea of a stopping place, but also that of a building or something of the kind for protection and convenience of passengers and freight." *Id.*

At the hearing held September 23, 1996, testimony elicited from representatives of MoPac revealed that the intermodal facility would be utilized for the receipt and distribution of freight. It clearly then is contemplated as being a "place where railroad trains regularly come to a stop for the ... purpose of receiving and discharging freight." Thus, the Court finds that the use of the land for a proposed intermodal facility is proper because it constitutes a "depot" within the statutory definition of "right of way."

### 4. MoPac Has No Intention of Building an Intermodal Facility

■ Landowners next argue that MoPac has no intention of building the proposed intermodal facility on the subject land. Their theory is that because MoPac previously acquired other land for the construction of an intermodal facility and did not in fact use the land, that they will do it again. There is no basis for this argument. Testimony presented at the hearing showed that there were valid reasons that the other land was not so utilized by the railroad. Specifically, there were traffic problems and environmental problems with the first site. Additionally, this argument is completely speculative on the part of the landowners. Counsel for MoPac stipulated at the hearing that the land would be used for the construction and maintenance of an intermodal facility.

### 5. The Subject Land is Zoned Residential

■ Defendants next argue that condemnation is not proper because the subject land is zoned residential. Because of the existing zoning, defendants contend that MoPac would not be able to build the proposed

intermodal facility.[2] Thus, MoPac should not be allowed to condemn land it could not use to construct its intermodal facility. In support of their argument defendants cite the Court to the Arizona Court of Appeals decision in *Tovrea v. Trails End Improvement Ass'n,* 130 Ariz. 108, 634 P.2d 396 (Ct.App. 1981).[3]

In *Trovrea,* the Arizona Court of Appeals held that a governmental body exercising its power of eminent domain in a "proprietary capacity" is bound by zoning ordinances. Thus, the court held that the plaintiff could not condemn land for the "construction and maintenance of a communications facility for the receipt and transmission of radio and television signals." *Id.* 634 P.2d at 396. Such a function, the court determined, was proprietary in nature. By contrast, the court noted that when a condemning entity is acting in its "governmental capacity", it is immune from zoning ordinances. *Id.,* 634 P.2d at 397. In conclusion, the court held that before a private entity can exercise its designated power of eminent domain, it must first demonstrate that it will be able to legally build the proposed project.

In a footnote, the *Tovrea* court conceded that the "governmental-proprietary" test has been criticized. *Id.,* 634 P.2d at 397, n. 1. In doing so, it stated "[o]ther courts hold that the power of eminent domain is inherently superior to the exercise of the zoning power and [that] a grant of eminent domain to a governmental unit renders the unit immune from zoning regulations. Still other states have adopted a "balancing-of-public interest" test." *Id.* As a federal district court presiding over this case by virtue of diversity jurisdiction, this Court is bound to apply the law of the State of Arkansas. *Erie Ry. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). However, the Arkansas courts have not yet addressed the issue of whether an entity exercising the power of

eminent domain is subject to compliance with zoning laws. Thus, the Court must make an "*Erie* educated guess" as to what the Arkansas Supreme Court would do when faced with this issue. *Faries v. Atlas Truck Body Mfr. Co.,* 797 F.2d 619, 621 (8th Cir.1986).

MoPac argues that the governmental-proprietary test and the balancing of the public interest test would likely be rejected by the Arkansas Supreme Court in favor of the "inherently superior" analysis. In support of their argument, MoPac cites the Court to the case of *City of Piggott v. Eblen,* 236 Ark. 390, 366 S.W.2d 192 (1963). At issue in *Eblen* was whether a municipal ordinance which conflicted with a state law was unconstitutional due to the conflict between the two. The ordinance provided that pinball machines or other gaming devices were a public nuisance and that it was unlawful to possess such machines inside the Piggott city limits. 236 Ark. at 391, 366 S.W.2d 192. State law, however, provided that amusement games played on pinball machines were lawful even though free games were given upon certain scores being made. The court held that the state law, "being paramount and supreme" had preempted the city in this field of legislation and therefore, rendered the ordinance a nullity. 236 Ark. at 395, 366 S.W.2d 192.

While not directly on point to the issue in the case at bar, the *Eblen* case provides considerable insight regarding the issue of whether a condemning entity is subject to compliance with zoning laws. In quoting from an earlier case, the Arkansas Supreme Court stated, "the statute of the State operates within the limits of the municipal corporation the same as it does elsewhere, and ... local laws and regulations are at all times subject to the paramount authority of the Legislature." *Id.* (quoting *Shipley Baking Co. v. City of Hartford,* 182 Ark. 503, 31 S.W.2d 944 (1930)). Indeed, such a result is

---

2. The property was annexed by the City of Marion on May 29, 1996. On June 25, 1996, the Marion City Council zoned the property "R–1, single-family residential."

3. Defendant landowners also cited the Court to the case of *City of Scottsdale v. Municipal Court of the City of Tempe,* 90 Ariz. 393, 368 P.2d 637 (1962). This case, however, is inapplicable to

the facts of the case at bar. *City of Scottsdale* involved a conflict between the municipal zoning ordinances of two different cities, as opposed to a conflict between a municipal ordinance and a state law. Clearly, the dynamics involved in a "city versus city" battle are not the same as those involved in a "city versus state" battle.

mandated by the Arkansas Constitution. *See* Ark. Const. Art. 12, § 4 (stating that "[n]o municipal corporation shall be authorized to pass any law contrary to the general laws of the state . . . .").

In the present case, the same analysis applies. The Arkansas Legislature has granted MoPac the power of condemnation in Arkansas Code Annotated Section 18–15–1202. Thus, a local zoning ordinance, being inferior to the lawmaking power of the State, cannot interfere with the Legislature's conferral of such right to a private entity. If this were the law, a city could prohibit the construction of roads, railroads, utility lines and a whole host of other necessary facilities by incorporating and zoning, or simply rezoning, the property at issue.

■ As pointed out by MoPac, its line runs through all types of zoned areas in the State of Arkansas, including residential, light commercial and heavy industrial. If MoPac could not penetrate a residentially-zoned area, there would be no rail service to any town or incorporated municipality in Arkansas. Accordingly, this is the very reason that Article 17, Section 1 of the Arkansas Constitution provides that "[a]ll railroads . . . shall have the right to *construct and operate a railroad between any points within the State . . . .*" Ark. Const. Art. 17, § 1 (emphasis added). Thus, MoPac contends that the Arkansas courts, if faced with the issue, would join the majority of jurisdictions which have addressed the issue in holding that municipal zoning laws are inferior to the power of eminent domain. *See, e.g., City of Flint v. Chesapeake & Ohio Ry. Co.,* 464 F.Supp. 423 (E.D.Mich.1978); *Seward County Board of Commissioners v. City of Seward,* 196 Neb. 266, 242 N.W.2d 849 (1976); *State ex rel. Askew v. Kopp,* 330 S.W.2d 882 (Mo.1960); *Fort Worth & D.C. Ry. Co. v. Ammons,* 215 S.W.2d 407 (Tex.Civ.App. 1948); *State ex rel. Helsel v. Board of County Commissioners of Cuyahoga County,* 37 Ohio Op. 58, 79 N.E.2d 698 (1947). The Court agrees.

The Court recognizes that there is a split of authority regarding this issue. However, it is apparent that the weight of authority supports MoPac's argument. Therefore, the fact that the subject land is zoned residential will not prevent MoPac from exercising its power of eminent domain and condemnation by MoPac in the instant case is proper. In light of this holding, the Court need not reach the issue of whether the function of MoPac in building its proposed intermodal facility is governmental or proprietary in nature. Likewise, the Court need not address the balancing test under the public interest analysis.

### 6. MoPac Owns Other Land on Which It Could Build the Intermodal Facility

■ Defendant landowners next argue that condemnation by MoPac should be prohibited because the railroad already owns land in West Memphis on which it could construct its intermodal facility. Testimony presented at the hearing of this matter indicated that the land currently owned by MoPac was unsuitable for the proposed facility for several reasons. First, the parcel was too small. Second, it was located in near a flood plain and was not an environmentally safe location. Furthermore, even if the Court were to find that MoPac lacked a rational basis for refusing to utilize its West Memphis property for the intermodal facility, it would still be bound to allow the railroad to condemn the subject property. The fact that a railroad might own other land upon which it could construct a proposed project is not a defense to a condemnation action. *See Cloth v. Chicago, R.I. & P Ry.,* 97 Ark. 86, 132 S.W. 1005 (1910). This is because the courts will not control the exercise of the railway company's discretion in locating its depots.

### 7. Irreparable Harm Would Result Because There Is an Existing Crop Growing on the Property

■ Landowners next argue that this Court should not issue an Order allowing condemnation because there is a cotton crop currently growing on this property. This argument must be rejected by the Court. First, at the hearing, counsel for MoPac stipulated on the record that the landowners would be allowed to harvest the existing crop. Thus, the landowners' current crops will suffer no harm. Second, the existence of crops on condemned property is simply an

element of damages. It is not a defense to the taking. *Arkansas State Hwy. Comm'n v. Hood,* 237 Ark. 202, 372 S.W.2d 387 (1963).

**8. Failure to Join Indispensable Parties**

■ Landowners further contend that the present condemnation action should be dismissed for failure to join indispensable parties, namely, a tenant farmer and the City of Marion. This argument lacks merit under the law. Under Rule 71A(f) of the Federal Rules of Civil Procedure, "[w]ithout leave of court, the plaintiff may amend the complaint at any time before the trial of the issue of compensation and as many times as desired." The Advisory Committee Notes state that due to the number of persons who may be interested in the property to be condemned, there is a likelihood that the plaintiff will need to amend its complaint, perhaps many times, to add new parties or state new issues. Clearly then, the failure to join the tenant farmer is not a basis for dismissal. As to the City of Marion, defendants argue that the City must be joined because the zoning ordinance constitutes an "encumbrance on the land." Therefore, they argue, the City has an interest similar to that of a mortgagee with regard to the subject property. Defendants have pointed to no authority for this proposition. The Court rejects this argument as facially erroneous. Even in the unlikely situation that defendants could find some support in law for their argument, MoPac would be entitled to amend its petition for condemnation to add the City of Marion as a party defendant.

**9. The Taking Is Private and Not Necessary to MoPac's Operations**

■ Defendants' final objection to the proposed condemnation is that the taking is both private in nature and not "necessary" to MoPac's operations. As to the "necessary" argument, the landowners argue that the taking should be prohibited because the plaintiff already owns land in West Memphis upon which it could build its facility. As this argument has already been addressed above, it will only be addressed briefly here. In determining whether the taking of property is necessary for public use, not only the present demands of the public, but those which may be fairly anticipated in the future may be considered by the Court. *Woollard v. Arkansas State Hwy. Comm'n,* 220 Ark. 731, 249 S.W.2d 564 (1952).

■ In the present case, representatives of MoPac testified that the land it currently owns in West Memphis is too small to accommodate the proposed facility. Further, they testified that there is a definite need for the intermodal project in that it would significantly reduce future transportation costs. Therefore, MoPac argues that the condemnation is "necessary" as that phrase has been interpreted by the Arkansas courts.

■ In *Woollard,* the Arkansas Supreme Court upheld the condemnation by the Arkansas Highway Commission of an easement having a width of 250 feet when it proposed to build a road of only 24 feet in width. In doing so, the court stated, "[t]here being testimony by experienced engineers that a 250–foot right-of-way is needed in this instance, the chancellor was correct in holding that the Commission's decision was not arbitrary or capricious." 220 Ark. at 734, 249 S.W.2d 564. Thus, the test under the Arkansas condemnation laws is not one of strict necessity in that the railroad would not be able to function without the proposed facility. If that were so, condemnation of specific property would never be "necessary" because the railroad would always be able to condemn other land.

■ As to the private taking argument, defendants assert that "plaintiff intends to sell at least portions of the lands to other companies such as, Fed Ex, UPS, and others who do not have the power of eminent domain." *See* Defendant Letitia Haygood's Brief in Support of Objections and Defenses to Taking Made Pursuant to 71A, p. 4. However, the fact that private industry may benefit in some incidental way does not prevent an entity from exercising its eminent domain power.

In *Gray v. Urban Renewal Agency,* 266 Ark. 376, 585 S.W.2d 31 (1979) (en banc), the Arkansas Supreme Court held that it was not a defense to an eminent domain action that

the property would be sold by the condemning party to a private developer for the construction of a high-rise building. 266 Ark. at 378, 585 S.W.2d 31. Similarly, the court in *Cloth, supra* held that the mere fact that private ends of others will be advanced by such public users will not defeat the right to condemn property. 97 Ark. at 89, 132 S.W. 1005. Finally, the "fact that private purposes are subserved [will] not exclude the idea that the public may also participate in the enjoyment of the utility." *St. Louis, Iron Mountain & Southern Ry. Co. v. Fort Smith & Van Buren Ry. Co.,* 104 Ark. 344, 148 S.W. 531 (1912).

 In the present case, it is not alleged that these private carriers will be the sole beneficiary of the condemnation. Rather, MoPac contends that the reduction in the cost of transportation will inure to the public as a whole. "To be public, the user must concern the public." *St. Louis, Iron Mountain & S. Railway Co. v. Petty,* 57 Ark. 359, 365, 21 S.W. 884 (1893). "If it is an aid in facilitating the business for which the public agency is authorized to exercise the power to condemn, or if the public may enjoy the use of it not by permission but of right, its character is public." *Id.* Thus, the Court finds that proposed taking is not for private purposes.

## III. CONCLUSION

For the foregoing reasons, the Court rejects the landowners defenses to the proposed taking. While the Court indeed sympathizes with the landowners, it is nevertheless bound to apply the law of the State of Arkansas as written by her Legislature and interpreted by her courts. However, in accordance with the stipulation of MoPac's counsel, the right of entry previously granted to the plaintiff will be limited to surveying the property until such time as the current crops are harvested.