Charles L. DANIELS, Director of Labor,
STATE of Arkansas v. CITY OF FORT SMITH, et al

79-285                                              594 S.W. 2d 238
Supreme Court of Arkansas
Opinion delivered March 3, 1980

*James P. Clouette* and *Michael R. Jones*, for appellant.

*Daily, West, Core, Coffman & Canfield; Warner & Smith*, by: *Gerald L. DeLung*, and *Hardin, Jesson & Dawson*, by: *Bradley D. Jesson*, for appellees.

*Herschel H. Friday* and *Bill S. Clark*, of *Friday, Eldredge & Clark*, for amicus curiae Associated General Contractors, Inc., Arkansas Chapter Associated Builders Contr. of Arkansas, Inc. and Industrial Developers of Arkansas.

*James E. Youngdahl, of Youngdahl, Larrison & Agee*, for amicus curiae Arkansas State AFL-CIO.

*Gayle Windsor, Jr.*, for amicus curiae Arkansas State Chamber of Commerce and Associated Industries, Inc.

· FRANK HOLT, Justice. In 1973 the voters of Fort Smith approved an industrial development bond issue for the financing of an industrial facility to be constructed and operated by the Unitog Corporation as authorized by Act 9 of 1960, as amended. (Ark. Stat. Ann. § 13-1601 et seq. [Repl. 1979]). After the construction was completed, appellant ordered appellees Unitog, B&B, Inc., the general contractor, and various subcontractors to insure that all workmen were paid minimum wages pursuant to the Arkansas Prevailing Wage Law, Act 74 of 1969, as amended. (Ark. Stat. Ann. § 14-630 et seq. [Repl. 1979]). Appellees immediately advised appellant that they would not comply with the order. Six

months later, appellant filed suit in chancery court seeking a declaratory judgment that Act 74 of 1969, as amended, applied to the Unitog project. The chancellor held that the Unitog project was not constructed for "public use" as required and defined under Act 74 of 1969; and, further, that Act 74 did not apply to the Unitog project financed under Act 9 of 1960, because Act 74 is in irreconcilable conflict with Act 9 as amended by Act 208 of 1971. (Ark. Stat. Ann. § 13-1615 [Repl. 1979]). The primary issue here is whether the Arkansas Prevailing Wage Law applies to work on a commercial construction project which is financed pursuant to an Act 9 industrial development bond issue.

Appellant first contends that the chancellor erred in not considering the Unitog project a "public work," and in not requiring the appellees to comply with Act 74 of 1969, as amended. The Act reads in pertinent part:

> § 14-631. It is hereby declared to be the policy of the State of Arkansas that a wage of not less than the prevailing hourly rate of wages for work of a similar character in the county in which the work is performed shall be paid to all workmen employed by or on behalf of any public body engaged in *public works* exclusive of maintenance work. . . . (Italics supplied.)

> §14-632 (1) Not less than the minimum prevailing hourly rate of wages for work of a similar character in the county in which the work is performed and not less than the prevailing hourly rate of wages for holiday and overtime work, shall be paid to all workmen employed by or on behalf of any public body *engaged in the construction of public works,* exclusive of maintenance work. (Italics supplied).

> § 14-630 (7) *'Public Works'* means all works constructed for *public use* whether or not done under public supervision or direction or paid for wholly or in part out of public funds; it does not include any work done for or by any drainage, improvement, or levee district; (Italics supplied.)

The thrust of appellant's argument in that the project was constructed for a public purpose; i.e., to create jobs and to improve the general economic conditions of the area. Therefore, it falls within the purview of § 14-630(7) defining "public works" inasmuch as the terms "public purpose" and "public use" are synonomous. In support of its contention, appellant relies primarily on *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W. 2d 633 (1960), where we held that Act 9 projects were considered public property used exclusively for public purposes within the meaning of Art. 16, §§ 5 and 6 of the Arkansas Constitution. Consequently, the property was not subject to ad valorem taxation. We also stated that the only purpose behind the legislature's passage of Act 9, and the voters' approval of the bond issue, was the "public welfare. . . . obviously and undoubtedly a 'public purpose.' " In view of this language, we agree that the Unitog project was constructed for a "public purpose." Even so, we find no language in *Wayland* which indicates that the terms "public purpose" and "public use" are synonomous, or that Act 9 projects were constructed for the public use. Similarly, although in *Hackler* v. *Baker, County Judge,* 233 Ark. 690, 346 S.W. 2d 677 (1961), we stated that the purpose of the people in providing for Act 9 projects "was to create jobs and thus prevent unemployment and loss of population rather than to assure the erection of a building;" we did not hold that Act 9 projects were constructed for the public use.

Appellees respond that even though the project was constructed for a public purpose, the statute requires that the project be constructed for the "public use." They argue that the terms are not synonomous, and that the project was clearly not constructed for the public's use. In support of their position, appellees rely on the case of *City of Little Rock* v. *Raines,* 241 Ark. 1071, 411 S.W. 2d 486 (1967), an eminent domain case, where we stated that the fact "a project is one for which public funds may be expended is not a sufficient basis for finding that use of the property is a public use justifying the taking of private property." We held that the taking of privately owned land (in connection with an Act 9 industrial park) for the purpose of selling the land to private industry was not a public use under the scope of eminent domain. Our holding provides, in effect, there is a distinction

between the terms "public purpose" and "public use." Even so, appellant argues that the distinction is necessary in eminent domain cases because a serious deprivation of one's private property by the sovereign is at stake. We are convinced that the distinction set forth in *City of Little Rock* v. *Raines, supra,* also governs in other cases involving Act 9 projects. We must therefore determine whether the project was constructed for a "public use" as required under § 14-630 (7).

In determining whether a public use exists, certain factors must be considered. The voters of Fort Smith approved the industrial development bond issue for the financing of the construction of the Unitog facility. The city then issued tax free municipal bonds and entered into a trust indenture agreement with a local bank whereby the city pledged the title to the real and personal property leased to the appellee Unitog as security for the payment of the principal and interest on the bonds. Although Unitog representatives negotiated and actually purchased the land, the property was immediately deeded to the city which in turn leased the property to appellee Unitog. When the bonds are retired, the city will reconvey the property to Unitog for $100 consideration.

Under the lease agreement, Unitog retains control over all buildings, equipment and other personal property at the facility. As such the general public does not have open access to and use of the facility such as they would have to a public library, courthouse or other public facility. Also, as provided in the Act, the bonds do not constitute a general indebtedness of the city. Ark. Stat. Ann. § 13-1706 (Repl. 1979). Here they are retired solely from revenues derived from the Unitog facility and not by any public funds or any manner of taxation. A project need not be constructed under direct public supervision to be considered a public work. § 14-630(7). The controlling issue, by this statute, is whether the project is a public work which is defined as "works constructed for *public use.*" (Italics supplied.)

Admittedly, the Unitog facility provides jobs for a substantial number of workers thereby reducing unemployment

and indirectly improving the general economic conditions in the area. Any new factory or industrial facility, however, would provide these same incidental benefits to the general public. Although the public will indirectly benefit from the facility, we hold, as did the chancellor, that the project was not constructed for the public use as required by § 14-630 (7); therefore, the appellees are not required to comply with Act 74 of 1969 as amended.

Appellant also contends that the chancellor erred in "repealing" Act 74 of 1969 as amended insofar as it applied to projects funded by revenue bonds issued under the authority of Act 9 of 1960 as amended. The appellant argues that even though the legislative purposes behind the Acts are different, they are not in conflict and are compatible except in the most strained interpretations. We should therefore give effect to both Acts. Appellees respond that the provisions of the Acts are in irreconcilable conflict, and the 1971 amendment (Act 208) to Act 9 controls inasmuch as it is the latest expression of the legislature.

The legislative purposes are stated in each Act:

§ 14-631, *supra.* (Act 74 of 1969)

§ 13-1602. (Act 9 of 1960 as amended). Any municipality and any county is hereby authorized to own, acquire, construct, reconstruct, extend, equip, improve, operate, maintain, sell, lease, contract concerning, or otherwise, deal in or dispose of any land, buildings, or facilities of any and every nature whatever that can be *used in securing or developing industry within or near the municipality or county.*
(Italics supplied.)

The preamble to Act 9 reads:

'Whereas, the people of the State of Arkansas have expressed themselves in favor of a more effective program of industrial development by their adoption of Amendment No. 49 to the Arkansas Constitution; and
'Whereas, it is desirable to implement and supplement the provisions of said Amendment No. 49 to the end of

carrying out the broadest and most aggressive possible industrial development program; now, therefore.'

We must however look beyond the stated purposes to determine whether the provisions of the statutes are conflicting. The key provision is § 13-1615, Act 208 of 1971, the amendment to Act 9, which provides:

Act 9 . . . . shall be liberally construed to accomplish the intent and purposes thereof and shall be the sole authority required for the accomplishment of such purposes. To this end, it shall not be necessary to comply with general provisions of other laws dealing with public facilities, their acquisition, construction, leasing, encumbering or disposition.

Although Act 74 of 1969 as amended is a fair labor standards type legislation, it is by definition narrow in scope and applies to a limited class of workers. See §§ 14-631 and 14-632. As appellant admits, it is "basically a method of providing a foundation wage for workers, on public works projects." It requires only that the prevailing minimum wage be paid to those workers involved in projects constructed for the public use. § 14-630(7). It is one of many statutes contained in Chapter 6, Title 14 of Ark. Stat. Ann. entitled PUBLIC WORKS—CONSTRUCTION CONTRACTS.

Section 13-1615 specifically provides that Act 9 shall be liberally construed; that Act 9 shall be the sole authority required for the accomplishment of the stated purposes, i.e., the securing and developing of industry; and that Act 9 projects do not have to comply with "other laws dealing with public facilities, their acquisition, construction, leasing, encumbering and disposition." We have interpreted the statute to mean that Act 9 projects need not comply with state laws concerning notice, bidding, and appraisal procedures. *Dumas et al* v. *Jerry, Judge,* 257 Ark. 1031, 521 S.W. 2d 539 (1975). See also §§ 17-304-17-309. In *Dumas* the property was deeded to the county by a private corporation; the county and the El Dorado Industrial Development Corporation (organized pursuant to Act 9) leased the property to an individual seeking to obtain industrial development of the property. We held

that Act 193 of 1945 (§§ 17-304-17-309) and Act 9 of 1960 as amended were in irreconcilable conflict inasmuch as the former required compliance with certain procedures before any real property owned by the county could be sold or conveyed, and the latter exempted Act 9 projects from compliance with the "general provisions of other laws dealing with public facilities, their . . . leasing . . . or disposition."

Act 9 of 1960, as amended by Act 208 of 1971, is clearly the most recent expression of the legislature. In view of *Dumas* it is clear that it operates as a repeal of the provisions of §§ 14-630 et seq. insofar as they conflict. Therefore we hold, as did the chancellor, that the two Acts are in irreconcilable conflict and the latter repeals the earlier one insofar as they conflict.

Affirmed.

SMITH, J., concurs.

HICKMAN, PURTLE and MAYS, JJ., dissent.

GEORGE ROSE SMITH, Justice, concurring. I join in the majority opinion for the same reasons that I expressed in *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W. 2d 633 (1960).

DARRELL HICKMAN, Justice, dissenting. The majority has not, in my judgment, been able to distinguish the case of *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W. 2d 633 (1960).

Since I consider *Wayland* controlling and it is not overruled, I feel it should be followed.

I would reverse the judgment.

RICHARD L. MAYS, Justice, dissenting. In 1969, the State of Arkansas adopted as a public policy a minimum wage standard for employees engaged in the construction of public work projects. Today, the Court refuses to apply this policy for the benefit of employees engaged in the construction of a project which was voted on by the public, financed on public credit and constructed on public property in the public in-

terest for a public purpose. Although the project is being used exclusively for the public purpose for which it was constructed, the Court holds that the project was not constructed for a *public use* and, therefore, is not a public work. The project is a manufacturing building for private enterprise which was developed under an act of the legislature designed to stimulate a strong industrial development program. The court strains to exclude employees engaged in the consruction of such public projects from any minimum wage protection implying that an aggressive industrial development program is incompatible with a minimum wage. I must strongly disagree.

The public effort to stimulate industrial development to provide employment for the unemployed does not require us to abandon legislation protecting the employed from substandard wages. The social objective of aiding the poor by attracting industry must accommodate the reality that a substantial number of those living on the threshold of poverty are not only unemployed but are employed at poverty wages. Therefore, no public effort to reduce poverty can be concerned with the unemployed to the exclusion of the underemployed.

Disregarding the social compatibility of minimum wage and industrial development legislation and implying to the contrary, the Court seizes upon provisions in the legislation promoting industrial developments which sanction non-compliance with general provisions of other laws affecting public facilities to repeal the minimum wage guarantee for employees working on public work projects. No public policy with the moral force of minimum wage legislation should be repealed by implication, especially by an act which generally speaks to the same social objective as that of minimum wage. See *Ward* v. *Harwood,* 239 Ark. 71, 387 S.W. 2d 318 (1965); *Mears* v. *City of Little Rock,* 256 Ark. 359, 508 S.W. 2d 750 (1974).

Furthermore, in the instant case, the minimum wage requirement does not affect those workers who will be employed by the industry but only those employed in the construction of the public building which houses the in-

dustry. The wage required is simply the prevailing hourly wage for work of a similar character in the county in which the work is performed. Just as we do not abandon building codes simply because they might increase cost, we do not abandon wage standards because they might deter an overreaching employer.

No superficial distinction between "public purpose" and "public use" can justify this result. No taxpayer will understand this distinction when informed that such projects are exempt from ad valorem taxes because they are considered "public property used exclusively for public purposes." *Wayland* v. *Snapp,* 232 Ark. 57, 334 S.W. 2d 633 (1960). No construction worker who is paid an indecent wage, or not paid at all for work on such projects, will understand this distinction when informed that the project is exempt from mechanic's or materialman's liens because it is considered a public building. *Dow Chemical Co.* v. *Bruce Rogers Co.,* 255 Ark. 448, 501 S.W. 2d 235 (1973). Neither the integrity of minimum wage legislation nor a definition of public works should depend on such a fine distinction.

In *Wayland, supra,* these projects were exclusively public projects which only incidentally benefited private enterprise. Today these projects are exclusively private projects which only incidentally benefit the public. Why should the nature of these projects change when the subject shifts from tax exemption to minimum wage?

I would reverse the judgment of the court below.

PURTLE, J., joins in this dissent.