The Honorable Denny Altes State Senator 8600 Moody Road Fort Smith, Arkansas 72903-6718
Dear Senator Altes:
I am writing in response to your request for an opinion on the following question:
 In light of the recent U.S. Supreme Court decision in Kelo v. New London ([U.S. Supreme Court,] 04-108), 268 Conn. 1, 843 A.2d 500, can a city in Arkansas use its power of eminent domain to take private property for a private enterprise?
RESPONSE
In my opinion, assuming your question inquires about an exercise of eminent domain similar to that in the Kelo case, for strictly economic development purposes,[1] with no primary underlying public use, the answer to your question is generally "no" under existing Arkansas case law and the Arkansas Constitution. This is true because Arkansas has adopted a narrower view of the so-called "public use" test than other states and the federal courts. The legality or constitutionality of any particular exercise of the power of eminent domain, however, must be analyzed under all the facts surrounding the proposed taking. Any number of independent factors must be weighed in determining whether particular property can be taken for various uses. I have set out a general discussion of the issue below, which may help frame the issues to be decided with regard to a particular proposed taking.
 KELO v. CITY OF NEW LONDON
On June 23, 2005, the United States Supreme Court handed down its decision in Kelo v. City of New London, 125 S.Ct. 2655, 162 L.Ed.2d 439, ___ U.S. ___ (2005). In Kelo, the City of New London had made plans to undertake an economic revitalization project, with the help of a private nonprofit corporation called the "New London Development Corporation ("NLDC.") The project included a planned waterfront conference hotel to be situated at the center of a "small urban village" that would include restaurants and shopping. Also planned were marinas, a pedestrian "riverwalk," eighty new residences, space for a U.S. Coast Guard museum, research and development office space and parking. Some of the parcels at issue were to be leased to private developers in exchange for their agreement to develop the land according to the terms of the development plan. The project was to be adjacent to a newly proposed research facility of Pfizer, Inc., and a newly developed state park. The City successfully negotiated to purchase most of the land needed, but failed to reach an agreement with several landowners. As a consequence, the NLDC instituted condemnation proceedings. The landowners thereafter sued in state court to prevent the exercise of the power of eminent domain with respect to their property. The landowners alleged that the taking of their properties would, among other things, violate the 5th Amendment of the United States Constitution, specifically the "Takings Clause" of that Amendment, which provides that ". . . nor shall private property be taken for public use, without just compensation."
After a partial victory for the landowners in the lower court, both sides appealed to the Supreme Court of Connecticut. The Supreme Court of Connecticut, noting that the relevant provisions of the Connecticut Constitution and the U.S. Constitution were "virtually identical" and that the plaintiffs had not alleged that the Connecticut Constitution provided more protection against takings than the U.S. Constitution, analyzed the state and federal constitutional provisions together. The Supreme Court of Connecticut upheld all of the proposed takings under the applicable statutes and the Connecticut and U.S. Constitutions. The U.S. Supreme Court granted a writ of certiorari to determine whether the takings violated the "public use" requirement of the Fifth Amendment. The Court did not address any state constitutional or statutory issues.
The U.S. Supreme Court, in a 5-4 decision, upheld the proposed taking. The Court held that the proposed taking would be executed pursuant to a "carefully considered development plan" and that the development plan was not "adopted to benefit a particular class of identifiable individuals" for purposes of applicable legal precedents. The Court upheld the proposed taking despite the fact that this was not a case in which the City was planning to open the condemned land to use by the general public and despite the fact that the private lessees would not be required to operate like common carriers, making their services "available to all comers," stating that:
 . . . this Court long ago rejected any literal requirement that condemned property be put into use for the general public [citation omitted.] Indeed, while many state courts in the mid-19th century endorsed "use by the public" as the proper definition of public use, that narrow view steadily eroded over time. . . . Accordingly, when this Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the broader and more natural interpretation of public use as "public purpose." [citations omitted.] . . . We have repeatedly and consistently rejected that narrow test ever since.
Id. at 17-18.
The Court thus held that the disposition of the case turned upon whether the City's redevelopment plan served a "public purpose" and noted that "[w]ithout exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field." Id. at 20. The Court therefore upheld the proposed taking as allowable under the 5th Amendment, stating that "[g]iven the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us . . . to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan. Because the plan unquestionably serves a public purpose, the takings challenged here satisfy the public use requirement of theFifth Amendment." Id. at 26. The Court was careful to point out, however, that:
 We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many States already impose" public use" requirements that are stricter than the federal baseline. Some of these requirements have been established as a matter of state constitutional law [footnote omitted], while others are expressed in state eminent domain statutes that carefully limit the grounds upon which takings may be exercised.
Id. at 36-37.
The decision in Kelo v. City of New London only involved a challenge under the Fifth Amendment to the United States Constitution. The Court did not discuss or adjudicate any Connecticut state constitutional or statutory issues, much less any such issues arising under Arkansas law. Although the Kelo decision eliminates any federal constitutional bar to the type of taking at issue therein, it does not, as your question seems to suggest, control or impact the question for purposes of Arkansas law. A review of relevant Arkansas statutes, the Arkansas Constitution and Arkansas case law is necessary to address that issue, and that is where our discussion must now turn.
 ARKANSAS STATUTES
It has been stated that the "power of the Legislature to delegate to a public agency power of condemnation of private property for public use is supreme." Fulton Ferry Bridge Co. v. Blackwood, 173 Ark. 645, 659,293 S.W. 2 (1927). See also, Yates v. Sturgis, 311 Ark. 618, 846 S.W.2d 633
(1993). It has also been held, however, that "statutes that relate to the power of eminent domain should be strictly construed in favor of the landowner." Pfeifer v. City of Little Rock, 346 Ark. 449, 57 S.W.3d 714
(2001), citing Columbia County Rural Development Authority v. Hudgens,283 Ark. 415, 678 S.W.2d 324 (1984).
There are scores of Arkansas statues that confer or delegate the power of eminent domain to municipalities or municipal entities.[2] It is impossible in this context to address and analyze every statute under which a city or other municipal entity might attempt to condemn property under circumstances where a private enterprise might ultimately be a beneficiary of the taking. I will therefore set out only the statutes most likely implicated by your question.
The general power of municipalities to exercise eminent domain is set out at A.C.A. § 18-15-301, originally adopted in 1875. It provides in pertinent part as follows:
 (a)(1) The right and power of eminent domain is conferred upon municipal corporations to enter upon, take, and condemn private property for the construction of wharves, levees, parks, squares, market places, or other lawful purposes.[3]
A.C.A. § 18-15-301(a)(1) (Repl. 2003).[4] Although the words "other lawful purposes" may appear expansive, the Arkansas Supreme Court has stated that it has not given a "broad and liberal construction to this section," [City of Little Rock v. Raines, 241 Ark. 1071, 411 S.W.2d 486
(1967) (citing City of Osceola v. Whistle, 241 Ark. 604, 110 S.W.2d 393
(1966)] and that "this clause cannot . . . be extended beyond the municipal purposes provided for in the Act of March 9, 1875 . . . of which the clause is a part." 241 Ark. at 1082.
Other statutes that may be implicated by your question include A.C.A. §§14-169-802 and 18-15-1505, each being the codification of Act 542 of 1971 (giving urban renewal agencies the power of eminent domain to "carry out urban renewal plan objectives") and A.C.A. §§ 14-169-215; 219 and14-169-605 (granting the power of eminent domain to any housing authority with regard to "any real property which it may deem necessary for its purposes"). Also potentially applicable is A.C.A. § 14-143-120 (granting the power of eminent domain to a Regional Intermodal Facilities Authority "[w]henever it shall be deemed necessary . . . in connection with the exercise of its powers"); and A.C.A. § 14-184-116 (granting the power of eminent domain to central business improvement districts to "condemn private property for the construction of the improvements described in the plan of improvement"). Other potentially implicated statutes include A.C.A. §§ 14-169-901 (granting municipalities eminent domain authority needed to participate fully in the federal "Community Development Act of 1974"); and 14-269-103(d)(1) (authorizing municipalities to condemn necessary lands needed for parks and recreational facilities).
Other statutes that implement constitutional amendments may be implicated by your question, including A.C.A. § 14-163-206(a)(1) (implementing Amendment 18 to the Arkansas Constitution (authorizing a tax to aid industries) and granting the power of eminent domain to acquire property necessary or desirable in connection with harbors, ports, river-rail and barge terminals); and A.C.A. § 14-168-304(7)(A) (implementing Amendment78 of the Arkansas Constitution (regarding redevelopment projects through the use of tax increment financing) and granting the power of eminent domain "to condemn property for the purposes of implementing the project plan"). In my opinion, the fact that a constitutional amendment authorizes a particular type of project does not necessarily confer any expanded power with regard to eminent domain in connection with such projects. For example, in my opinion, the fact that A.C.A. §§ 14-168-301 to -322 (regarding tax increment financing) implements Amendment 78 to the Arkansas Constitution does not confer any separate eminent domain rights thereunder. Amendment 78 does not mention eminent domain and in my opinion the exercise of eminent domain under A.C.A. § 14-168-304(7)(A) is subject to the same limitations and restrictions as any other statutorily authorized power of eminent domain. Cf. City of Little Rock v. Raines,241 Ark. 1071, 1080, 411 S.W.2d 486 (1967) (rejecting the City's argument that Amendment 49 authorized the exercise of eminent domain in that case, stating "[n]othing in that amendment, the resolution proposing it, its content or the ballot title under which the people adopted it, even faintly intimated to the voters that it would permit the taking of private property for securing and developing industry. . . ."). See also,Shellnut v. Arkansas Game Fish Commission, 222 Ark. 25, 258 S.W.2d 570
(1953) ("[e]ven though Constitutional Amendment 35 gives broad powers to the Commission, nevertheless, the Commission is subservient to, and bound by, Article 2, 22 of the Constitution. . . ."). In addition, it is generally held that an amendment to the state constitution "fits into that organic body, displacing whatever may be in conflict with or repugnant to the provisions of the amendment" (Priest v. Mack,194 Ark. 788, 109 S.W.2d 665 (1937)), and that "[n]o interpretation of a constitutional amendment should be allowed which would conflict with any other provision of the constitution unless it is absolutely necessary to give effect to the amendment. State v. Donaghey, 106 Ark. 56,152 S.W. 746 (1912).
Again, it is impossible to analyze the applicability of the statutes discussed above to any particular proposed taking of land absent a factual backdrop surrounding the proposed taking. Many of the statutes listed above purport to convey expansive power to condemn land for the legislative purposes enumerated. See e.g., A.C.A. § 14-143-108 (part of the "Regional Intermodal Facilities Act" authorizing the construction of industrial warehouse and distribution facilities located at or near the intermodal facility for the purpose of developing industry); A.C.A. §14-163-206 (authorizing, under the enabling legislation to Amendment 18, the condemnation of land necessary for securing and developing factories, industries and facilities for them); A.C.A. § 14-168-305(d), as amended by Act 2231 of 2005, § 2 (authorizing the condemnation of land in connection with tax increment financing redevelopment districts in "blighted area[s]" including vacant and unimproved land "substantially impairing growth or arresting the growth of the city," and defining "blighted area" at A.C.A. § 14-168-301(3)(B) as including "open areas," which because of "lack of accessibility" or "otherwise" substantially impair or arrest the sound growth of the community);[5] A.C.A. §14-169-703(a)(2)(B)(ii) and (iii) (authorizing urban renewal projects, in connection with the condemnation of open land necessary for "sound community growth"); and A.C.A. § 14-169-901(6) (authorizing cities and counties to exercise eminent domain and "community development in its broadest sense" in order to participate fully in the federal "Community Development Act of 1974").
It must be remembered, however, that legislative authorization to condemn property, however clearly conferred, may not always pass constitutional muster. See e.g., Columbia County Rural Development Authority v.Hudgens, supra (noting that "the original Rural Development Authority Act included the power of eminent domain for private use, making the act constitutionally suspect"); and County of Wayne v. Hathcock,471 Mich. 445, 684 N.W.2d 765 (2004) (County's proposed taking of land for 1,300 acre business and technology park, which would also include a conference center, hotel accommodations and a recreational facility, was authorized by the applicable statute, but did not pass constitutional muster under provision of Michigan Constitution, overruling what has been called the "landmark"[6] case of Poletown Neighborhood Council v. Detroit,410 Mich. 616, 304 N.W.2d 455 (1981)). See also, Mary Massaron Ross, PUBLICUSE: DOES COUNTY OF WAYNE V. HATHCOCK SIGNAL A REVIVAL OF THE PUBLIC USELIMIT TO THE TAKING OF PRIVATE PROPERTY? 37 Urb. Law. 243 (Spring, 2005). An analysis of the Arkansas Constitution, therefore, and the various decisions interpreting it, is necessary to fully address the issue.
 THE ARKANSAS CONSTITUTION
Article 2, § 22 of the Arkansas Constitution of 1874 provides as follows:
 The right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefore.[7]
I have not found any similar constitutional language in any other state constitution in the United States.[8] Specifically, I have not found any other constitutional language, state or federal, that declares the right of property as being "higher than any other constitutional sanction" in the context of eminent domain. It has also been stated that this "section goes further than most American constitutions in that it requires just compensation for damaging private property, as well as for its taking." Arkansas Highway Commission v. 1st Pyramid Life InsuranceCompany, 265 Ark. 417, 427, 579 S.W.2d 587 (1979) (Fogelman, J. dissenting). See also, Note, REVISITING THE TAKINGS-BASED ARGUMENT FORCOMPENSATING THE WRONGFULLY CONVICTED, 60 N.Y.U. Ann. Surv. Am. L. 97 (2004) (characterizing the language of Arkansas Constitution, art. 2, §22 as an "especially strong takings provision").[9]
Under this constitutional provision, property may only be taken for a public, not a private use. Columbia County Rural Development Authority v.Hudgens, 283 Ark. 415, 678 S.W.2d 324 (1984). See also, Arkansas StateHighway Commission v. Alcott, 260 Ark. 225, 539 S.W.2d 432 (1976). The determination of whether a particular taking is for a "public use" under this constitutional language is a judicial question which the owner has a right to have determined by the courts. See e.g., City of Little Rock v.Raines, 241 Ark. 1071, 411 S.W.2d 486 (1967). A review of pertinent Arkansas case law is therefore necessary in determining the contours of the words "public use."
 ARKANSAS CASES
Most relevant for purposes of your question is the case of City of LittleRock v. Raines, 241 Ark. 1071, 411 S.W.2d 486 (1967). In Raines, the Arkansas Supreme Court denied the City of Little Rock the right to exercise eminent domain (under any one of several statutes), to create an industrial park and lease the site to private businesses. The court framed the issue as being twofold: 1) whether the power of eminent domain had been delegated to the city for that purpose; and 2) whether the use for that purpose was a "public use" satisfying constitutional requirements for the exercise of the power. In Raines, the City of Little Rock proposed to take agricultural property for purposes of establishing the industrial park. Although the City had asserted plans for a port in the vicinity, the court upheld the trial court's findings that "the proposed taking . . . [was] for the establishment of an industrial park . . . and that the use [wa]s for other than a port facility." Id. at 1077. The court found no delegation of the power under any of the asserted statutory provisions (what are now A.C.A. § 14-164-201 et seq.;14-186-201 et seq.; 14-186-301 et seq.; 14-163-201 et seq.; and18-15-301) and questioned whether the state would have any such power to delegate "in view of the use to which the property would be put." The court stated: "Without the consent of the owner, private property cannot be taken for private use, even under the authority of the legislature."241 Ark. at 1082-83. The court recited the applicable test as being twofold: "[f]or a use to be public it is necessary that the public shall be concerned in the use to be made thereof and the purpose for which the property is to be used must in fact be a public one."[10] Id. at 1083 (citing Cloth v. Chicago R.I.P. Ry. Co., 97 Ark. 86, 132 S.W. 1005
(1910) and St. Louis I.M. S. Ry. Co. v. Petty, 57 Ark. 359,21 S.W. 884 (1893)). (Emphasis added).[11]
The Raines court relied on language from the 1893 case of Railway Co. v.Petty, which stated that:
 A railway cannot exercise the right of eminent domain to establish a private shipping station for an individual shipper. If the station is for the exclusive use of a single individual, or a collection of individuals less than the public, that stamps it as a private use. . . . The fact that the railway's business would be increased by the additional private facilities is not enough to make the use public.
241 Ark. at 1083 (emphasis added), quoting Railway Co. v. Petty,57 Ark 359, 365, 21 S.W. 884 (1893).
The Cloth case, supra, also cited by the Raines court, makes clear, however, that incidental private benefit will not defeat a public use. The court in Cloth stated that:
 If the use for which the property is desired is in fact a public one, then the right to condemn the property follows. The mere fact that private ends of others will be advanced by such public uses will not defeat the right to condemn the property. . . . [t]he character of the use is no less public, and that public character is not changed, although private purposes will be incidentally served. . . ."
97 Ark at 89, citing Petty, supra (emphasis added). See also, City of ElDorado v. Kidwell, 236 Ark. 905, 370 S.W.2d 602 (1963) (stating that: "the fact that some individual developer of an addition will incidentally benefit by the sewer line does not destroy the power of the city).
The holding in Raines with regard to the use of eminent domain for a planned industrial park and the views expressed therein were discussed in Stephen M. Reasoner, Eminent Domain — Public Use — Rights of Way,
22 Ark. L. Rev. 211 (1968-69) as follows:
 Despite a substantial amount of litigation on the subject, there is no settled definition of "public use," and in fact "use" has been held to be susceptible to two different meanings — "employment" and "advantage." However, two lines of general agreement may be drawn from the cases on the subject. The narrower view, or employment doctrine, requires actual use of, or at least a theoretical right to use, the property taken. Under the broader view, or advantage doctrine, anything that benefits or enhances the welfare of a substantial part of the community, even if the public does not or cannot actually participate in the use, is a public use. In essence, this broader doctrine substitutes the term "public purpose" for "public use."
* * *
 In the recent case of City of Little Rock v. Raines . . . the Arkansas Supreme Court made it clear that despite its liberality in interpreting what constituted "public use," it would not depart from its enunciated doctrine and embrace the "public purpose" or "beneficial use" concept.
Id. at 211-213. See also, Elizabeth F. Gallagher, BREAKING NEW GROUND:USING EMINENT DOMAIN FOR ECONOMIC DEVELOPMENT, 73 Fordham L. Rev. 1837, 1853 (March 2005), stating that: "[j]udicial interpretations of the public use requirement can be categorized by their outcomes as either narrow or broad. The narrow interpretation, with very few exceptions, limits public use to situations where the public owns the property or has significant access to the property. Under the narrow interpretation, economic development does not satisfy the public use requirement. The broad interpretation equates public use with public benefit or advantage and thus may consider the use of eminent domain to transfer property to a private party for economic development to satisfy the public use requirement").
In this regard, the Connecticut Supreme Court, in its Kelo decision interpreting the Connecticut Constitution, "acknowledge[d] that the courts of Arkansas, Florida, Kentucky, Maine, New Hampshire, South Carolina and Washington have, using a narrow view of their public use clauses, ruled that economic development is, by itself, not public use for eminent domain purposes." Kelo v. City of New London, 268 Conn. 1,843 A.2d 500, 532 (2004) (emphasis added), citing Little Rock v. Raines,supra. See also, Roy Whitehead and Lu Hardin, GOVERNMENT THEFT: THETAKING OF PRIVATE PROPERTY TO BENEFIT THE FAVORED FEW, 15 Geo Mason U. Civ. Rts. L.J. 81, (footnote 49) (Winter 2004) (stating that the Arkansas Supreme Court has decided that a government taking of property to turn it over to a private entity for an industrial site to enhance economic development is not a public use under Arkansas Constitution, art. 2, §22); Elizabeth F. Gallagher, BREAKING NEW GROUND: USING EMINENT DOMAINFOR ECONOMIC DEVELOPMENT, 73 Fordham L. Rev. 1837, 1849 (March 2005) (stating that "[c]urrently, state courts, including those in Arkansas, Florida, Kentucky, Maine, New Hampshire, South Carolina, and Washington, do not view economic development as a valid public use for the exercise of eminent domain;" Dana Berliner, AMERICAN LAW INSTITUTE — EMINENTDOMAIN AND LAND VALUATION LITIGATION, American Bar Association Continuing Legal Education ALI-ABA Course of Study, (January 6-8, 2005), stating that "Arkansas, Florida, Illinois, Kentucky, Maine, Montana, South Carolina, and Washington all hold that condemnation for the purpose of increased taxes and jobs, rather than the elimination of slums or blight, is not a public use"); and William J. Appel, J.D., EMINENTDOMAIN: INDUSTRIAL PARK OR SIMILAR DEVELOPMENT AS PUBLIC USE JUSTIFYINGCONDEMNATION OF PRIVATE PROPERTY, 62 A.L.R.4th 1183 (1988 and update 2004).
The Connecticut Supreme Court, on the other hand, noted that Connecticut had long taken a "flexible" construction of the Connecticut public use clause. The court cited a Connecticut decision from 1866, involving the taking of land for a grist mill (Olmstead v. Camp, 33 Conn. 532, 89 Am.Dec. 221 (1866)) holding that public use can mean public advantage and that in fact "public use" was synonymous with "public advantage." Id. at 522, n. 31.
Arkansas displays no similar history in the context of economic development, whether in early cases, or more recent ones. In fact, case law from as recently as 1980 supports the proposition that the terms "public use" and "public purpose" are not synonymous in Arkansas for purposes of eminent domain law. The court in Daniels v. City of FortSmith, 268 Ark. 157, 594 S.W.2d 238 (1980), although not faced with an eminent domain issue, had an opportunity to characterize the holding inRaines. At issue in Daniels was whether a contractor on an Act 9 bond project (consisting of an industrial facility to be constructed and operated by the Unitog Corporation), was required by law to pay minimum wages under a statute requiring such payment on all "public works" constructed for "public use." The contractor argued that even though the project was construed for a public purpose, that fact was not synonymous with "public use" and as such he was not required to pay the prevailing minimum wage, relying on the Raines case. The court agreed, stating:
 Appellees respond that even though the project was constructed for a public purpose, the statute requires that the project be constructed for the "public use." They argue that the terms are not synonymous, and that the project was clearly not constructed for the public's use. In support of their position, appellees rely on the case of City of Little Rock v. Raines, 241 Ark. 1071, 411 S.W.2d 486 (1967), an eminent domain case, where we stated that the fact "a project is one for which public funds may be expended is not a sufficient basis for finding that use of the property is a public use justifying the taking of private property." We held that the taking of privately owned land (in connection with an Act 9 industrial park) for the purpose of selling the land to private industry was not a public use under the scope of eminent domain. Our holding provides, in effect, there is a distinction between the terms" public purpose" and "public use."
Id. at 160. (Emphasis added).
In my opinion, therefore, at least in the context of economic development, Arkansas is not one of those states in which the narrower view of the "public use" doctrine has "eroded over time," since the mid-19th century, as described by the United States Supreme Court inKelo. See, City of New London v. Kelo, supra at 17. Rather, the Arkansas Supreme Court in 1967, in the Raines case, cited the same test for "public use" that it used in 1910 in Cloth v. Chicago Rock, Island Pacific Railway Company, 97 Ark. 86, 132 S.W. 1005 (1910).[12] In this regard, the Raines court echoed and solidified the earlier reluctance of the court to expand the concept of "public use" to include takings for purely economic development purposes. See e.g., Ozark Coal Company v.Pennsylvania Anthracite Railroad Company, 97 Ark. 495, 501, 134 S.W. 634
(1911) (stating that "[w]e do not have to go as far in this case as some of the courts have done, holding that the operation of a coal mine or manufacturing plant constitutes a public necessity or enterprise, is of itself a public use which may justify the exercise of the right of eminent domain").
A number of eminent domain cases have been decided after the issuance of the Raines decision upholding proposed takings where private individuals or entities were benefited. Some of these decisions attempt to characterize or distinguish the scope of the holding in Raines.
For example, in Dowling v. Erickson, 278 Ark. 142, 644 S.W.2d 264
(1983), at issue was a statute allowing a landlocked landowner to condemn a right of way or road over the property of another. It was alleged that the statute was unconstitutional as allowing the exercise of eminent domain for a private use. The court upheld the constitutionality of the statute, noting that the road would be deemed a public one and that anyone who had the occasion to use it could do so. The court also noted that any reliance on Raines to attack the taking was misguided, stating: "[t]he appellant, however, misconstrues the term "public use in fact", as used in that case.". . . The distinction between public and private use is qualitative — not quantitative" noting that the "character of a road . . . is not determined by its length or the places to which it leads, nor by the number of persons using it." Id. at 144 (citing Pippin v.May, 78 Ark. 18, 93 S.W. 64 (1906)). The "qualitative" purpose at issue in Dowling was a "road" which was "free and common to all citizens." Id.
The court stated further:
 We think the result reached here is not inconsistent with dictum in Raines,[13] where we said the right of property is before and higher than constitutional sanction. Granted, in one sense we are employing the process of condemnation against one property owner to serve the needs of another property owner for what is, in part, a private use — an access road. But that result is, we believe, justified by a balancing of equities, in that the imposition on the first owner is relatively slight in comparison to the benefit to the second, and, more importantly, it serves legitimate public interests: the creation of a road available to the public and the transformation of land which would otherwise remain useless into potentially valuable and productive property.
 Id. at 145.
The same principle was apparently at play in Hale v. Southwest ArkansasWater District, 244 Ark. 647, 427 S.W.2d 14 (1968), wherein the court upheld the taking of land for a canal and a pipeline to transport water. It was alleged that the taking was private because, at that time, the Nekoosa-Edwards Paper Company was the only consumer of the water district. The court noted that by law the water district was obligated to "serve any member of the public desiring its services," and "our position would be otherwise if Nekoosa-Edwards . . . were the only customer who had a right to use the water." The "qualitative" purpose at issue inHale was the provision of water. See also, Columbia County RuralDevelopment Authority v. Hudgens, 283 Ark. 415, 678 S.W.2d 324 (1984) (condemnation of land for a water supply lake was proper use of eminent domain). The court did not "find anything to the contrary in City ofLittle Rock v. Raines. . . ." Id. at 651.
Most recently, in Pfeifer v. City of Little Rock, 346 Ark. 449,57 S.W.3d 714 (2001), the Arkansas Supreme Court upheld the exercise of eminent domain by the City of Little Rock to create a "park" where some structures on the land were to be leased to private entities. The park was conceived to be used in conjunction with the William J. Clinton Presidential Library Complex and portions were to be leased to private entities and/or the federal government. The landowner (Pfeifer), alleged that the "true purpose of the condemnation proceeding was for the City to acquire property for a "building ready" site for the complex, and that this purpose "[wa]s not one which the Arkansas legislature delegated to the City for purposes of eminent domain." Id. at 455. The court stated that the "crux of Pfeifer's argument on appeal is that the City did not need all of his property for the library and complex grounds and, that even if all of the property was needed, the creation of the library and complex is not a proper statutory[14] purpose for taking the property."Id. at 453.
The court noted that a "public entity's right of eminent domain is a constitutional privilege granted with limitations." Id. at 460. The court recited the test applicable to the facts in Pfeifer as follows: "[f]irst, there must be established the need for taking for public use or purpose," which the court concluded was a judicial question. "Second, the condemnation of land must be according to the law." Finally, the court stated that "in reviewing the necessity of the taking for public use, the legislative determination is subject to review in cases of fraud, bad faith, or gross abuse of discretion." Id. Because the first point of appeal was that the City did not establish a sufficient "need" for Mr. Pfeifer's property, a large portion of the court's decision focuses on this "need" element, or what the court called the "necessity" of taking Mr. Pfeifer's property.[15] The court decided that a sufficient need was established. For his second point on appeal and more relevant for our purposes, Mr. Pfeifer alleged that "the City did not have the authority to condemn his property under the guise of creating a city park only to then lease portions of the property to a private entity and the federal government for a library and meeting complex." The court twice reframed this issue, however, stating that the "real question" was "whether the City's assertion that this land will be a park encompasses the idea that the presidential library and complex can also sit on this site as part of the city park." Id. at 463. See also, Id. at 466 ("[h]owever, the chancery court posed the question best by asking whether the City can condemn property to create a park in which the University of Arkansas system, or any other non-City entity can lease some of the property to accomplish their plans of a presidential library, park, and complex"). The court analyzed the pertinent statutes to determine whether the City had been delegated the authority at issue. It upheld the taking under the powers granted municipalities to manage "parks" and under the broad definition of a "park" in applicable statutes. See A.C.A. §§ 22-4-501;14-269-103; and 22-4-101.
In my opinion, the Arkansas Supreme Court in Pfeifer, therefore, did not depart from the Raines court's holding that takings for purely economic development purposes do not constitute a "public use" under eminent domain law. In fact, the court in Pfeifer cited Raines with approval and quoted from that decision. 346 Ark. at 459, 463-64. In essence, thePfeifer court held that the qualitative use at issue in that case was a "park." The only question, as the court put it, was whether the leased buildings could be properly included as part of this use. The court found that they could be. In my opinion this case does not depart from the Arkansas Supreme Court's traditional "narrow" view of the "public use" test in the context of economic development.
Another line of Arkansas cases, both before and after the Raines
decision, indicates that the removal of "blight" or "slum clearance" can also be a proper underlying public use for eminent domain purposes despite the fact that private entities may be incidentally benefited.
As early as 1940 (before the Raines decision), the Arkansas Supreme Court upheld a "Housing Authority Act," the purpose of which was "slum clearance." Hogue v. The Housing Authority of North Little Rock,201 Ark. 263, 144 S.W.2d 49 (1940). The Court found the "the primary purpose or intent [of the Act to be] slum clearance by removing the evils existing therein . . . which are a great detriment to the public welfare of our citizens generally and in the attempted prevention of which private agencies cannot successfully cope." Id. at 267. The court used very broad language in its opinion, referring more than once to the "public purpose" and/or "public uses and purposes" served by the authority. Id. at 267, 268, 269 and 270.[16] The court also cited a number of decisions from other states which utilized a broader view of public use than Arkansas decisions, going so far at the end of its opinion to quote the following language: "[m]oreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that today there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion." Id. at 275 (quoting Dornan v. Philadelphia HousingAuthority, 331 Pa. 209, 200 A. 834 (1938)). Two Justices dissented from the majority opinion in Hogue. See Id. (Smith and Mehaffy, J.J. dissenting). See also, Kerr v. East Central Arkansas Regional HousingAuthority, 208 Ark. 625, 187 S.W.2d 189 (1945) (upholding the use of eminent domain by Regional Housing Authorities in rural areas, relying onHogue and noting that any difference between urban and rural areas was "one of degree"); and Adams v. Sims, 238 Ark. 696, 385 S.W.2d 13 (1966) (upholding the exercise of eminent domain in connection with a "Speedway Urban Renewal Project" under A.C.A. §§ 14-169-701 et seq., relying onKerr).
The Hogue case was cited with authority in Rowe v. The Housing Authorityof the City of Little Rock, 220 Ark. 698, 249 S.W.2d 551 (1952). InRowe, taxpayers attacked the constitutionality of the "Urban Redevelopment Law," or the so-called "Blighted Area Law." The parties inRowe stipulated that no factual issues were to be decided in the case and as a consequence the sole issue was the constitutionality of the Act in question. The court decided that most of the constitutional objections were controlled by the Hogue decision. The only new allegation "relate[d] to the right of the Housing Authority, after redeveloping the `blighted area' to then resell portions of the redeveloped property to individuals other than those whose property had been taken by the Housing Authority in the exercise of eminent domain." Id. at 702. The plaintiff argued that "the effect of such taking by eminent domain and reselling to other private individuals is to allow private property taken for so-called public use to be resold to other private individuals." Id. at 702. The court, again relying on the holdings of sister states, upheld the constitutionality of the act. The court quoted one court decision in particular, which reasoned that ". . . plaintiff misconceives the nature and extent of the public purpose which is the object of this legislation. That purpose . . . is directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished the public purpose is completely realized. When, therefore, the need for public ownership has terminated, it is proper that the land be re-transferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. Itis not the object of the statute to transfer property from one individualto another; such transfers, so far as they may actually occur, are purelyincidental to the accomplishment of the real or fundamental purpose."Id. at 703 (emphasis added) (quoting Belovsky v. RedevelopmentAuthority, 357 Pa. 329, 54 A.2d 277 (1947)). See also, City of LittleRock v. Raines, supra at 1086 (distinguishing the slum clearance in Rowe
from the proposed industrial park in Raines, by stating that in Rowe,
"the right of sale of portions of the property after the public purpose was accomplished was held not to make the use any the less public nor the Acts unconstitutional. Here, the sole and only purpose is to acquire the property of appellees now being used for agricultural purposes and to sell or lease it to private industries").
Essentially the same conclusion as that reached in Rowe was reached inGray v. NLR Urban Renewal Agency, 266 Ark. 376, 585 S.W.2d 31 (1979), a decision rendered after the Raines decision. In Gray, a landowner objected to the condemnation of her house for a project in which it would ultimately be sold to a private developer who planned a "ten-story high rise" on the property. The landowner contended that her house was not "blighted" or a "slum" or in any way dangerous to the public health, safety or morals. Evidence was presented, however, that showed that over fifty percent of the landowner's property's value was gone and that over fifty percent of the structures in the area were dilapidated and not capable of repair. Id. at 377. The court deemed the matter controlled byRowe. The landowner also relied upon the Raines decision, but the court "fail[ed] to see the analogy" stating: "[i]n the Raines case, supra, the City of Little Rock sought to takes Raines' farm so that the City could hold it for sale for industrial purposes. Here however, the Urban Renewal Agency's purpose in taking the property is directed toward clearance, reconstruction and rehabilitation of a blighted area." Id. at 378. Again, as in Hogue, two Justices dissented.
A review of the foregoing cases reveals that the court will look to the public use underlying the exercise of eminent domain in a particular case, notwithstanding the fact that certain private individuals or entities may be incidentally benefited. See, e.g., Cloth, supra (citingRailway Co. v. Petty, 57 Ark. 359, 21 S.W. 884 (1893)). A primary and separate underlying public use apart from economic development must in my opinion exist to sustain a taking under Arkansas law. The court in Dowlingv. Erickson, supra, referred to the test as a "qualitative one," and the court has upheld the exercise of the power where the qualitative use was for a road (Dowling, supra); or the provision of water (Hale, supra); or for a park (Pfeifer, supra) or for the removal of blight (Gray, supra), even where the use would benefit a small segment of the public or where a portion of the land taken would ultimately be resold or leased for use by private entities.
Nothing in these decisions, however, indicates any retreat from the view expressed by the Raines court that economic development alone is not an allowable underlying public use for purposes of eminent domain. As a consequence, to the extent your question ("can a city in Arkansas use its power of eminent domain to take private property for a private enterprise") is whether the exercise of eminent domain is allowable for economic development purposes alone, as in the Kelo v. New London case, in my opinion the answer is generally "no."
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:ECW/cyh
[1] The United States Supreme Court noted that "those who govern the City [of New London] were not confronted with the need to remove blight. . . ." The Court noted that the City "invoked a state statute that specifically authorizes the use of eminent domain to promote economic development." Id. at 26.
[2] See e.g., A.C.A. §§ 14-54-106; 14-88-202; 14-91-303; 14-92-219;14-92-222; 14-92-310; 14-93-110; 14-93-113; 14-94-112; 14-116-402;14-117-305; 14-118-114; 14-120-103; 14-120-217; 14-120-306; 14-121-809;14-121-1107; 14-122-111; 14-137-112; 14-139-104; 14-140-207; 14-143-120;14-163-206; 14-168-304; 14-169-215; 14-169-219; 14-169-605; 14-169-802;14-169-901; 14-184-104; 14-184-116; 14-185-111; 14-186-210; 14-186-304;14-186-407; 14-201-110; 14-205-112; 14-207-106; 14-218-133; 14-232-113;14-233-107; 14-234-111; 14-234-215; 14-234-516; 14-235-210; 14-238-112;14-250-111; 14-269-103; 14-302-105; 14-303-204; 14-303-303; 14-304-109;14-317-112; 14-318-111; 14-320-120; 14-358-102; 14-359-112; 14-360-102;14-361-104; 14-361-121; 14-362-120; 18-15-201; 18-15-301; 18-15-401;18-15-501; 18-15-601; 18-15-701; 18-15-801; 18-15-901; 18-15-1001;18-15-1101; 18-15-1401; 18-15-504; 18-15-1505; 18-15-1601; 23-17-201;23-18-307; 23-18-406; 23-18-1107; 23-18-528; 25-20-201; 25-20-309; and25-20-407.
[3] See also A.C.A. § 18-15-201, which grants municipalities the right of eminent domain to "condemn property for the purpose of parks, boulevards, and public buildings."
[4] The remaining subsections of the statute address the power of eminent domain in the specific context of municipal acquisition of waterworks and electric transmission systems.
[5] See also, Thomas M. Carpenter, THE FIRST ROUND OF THE "PUBLIC USE"QUESTION: KELO V. CITY OF NEW LONDON, CITY AND TOWN (Arkansas Municipal League) Vol. 61, No. 8 (August 2005) at 22, 23, stating that "the same kinds of eminent domain provisions present in the Kelo case are also involved in this Act."
[6] See Kelo v. City of New London, 268 Conn. 1, 843 A.2d 500,531 (2004) at n. 39.
[7] Two other provisions of the Arkansas Constitution should be noted. They are article 2, § 23, which provides that: "[t]he State's ancient right of eminent domain and of taxation, is herein fully and expressly conceded; and the General Assembly may delegate the taxing power, with the necessary restriction, to the State's subordinate political and municipal corporations, to the extent of providing for their existence, maintenance and well being, but no further" and Article 12, § 9, which provides that: "[n]o property, nor right of way, shall be appropriated to the use of any corporation, until full compensation therefore shall be first made to the owner, in money; or first secured to him by a deposit of money; which compensation, irrespective of any benefit from any improvement proposed by such corporation, shall be ascertained by a jury of twelve men, in a court of competent jurisdiction, as shall be prescribed by law." See also Arkansas Constitution, Article 17, § 9. I will not analyze these provisions in detail in light of your question's focus on the power of cities to take property by eminent domain. The former provision above addresses the State's right of eminent domain and the latter provision has been held inapplicable to the exercise of eminent domain by municipal corporations. See, Paragould v. Milner,114 Ark. 334, 170 S.W. 78 (1914).
[8] Apparently, however, similar language was once a part of the Kentucky Constitution. See Tracy v. Elizabethtown, Lexington and BigSandy Railroad, 78 Ky. 309, 1880 WL 7202 (1880).
[9] Arkansas' immediately preceding Constitution of 1868 (the "Reconstruction Constitution") contained markedly different language at Article I, § 15, as follows: "[p]rivate property shall not be taken for public use without just compensation therefor." Earlier Arkansas Constitutions contained no express provisions regarding eminent domain, although the State's power of eminent domain has been held to be implicit therein. See e.g., Nature Conservancy v. Kolb, 313 Ark. 110,853 S.W.2d 864 (1993) and Cairo Fulton R.R. Co. v. Turner, 31 Ark. 494, 25 Am.Rep. 564 (1876). At least one commentator has stated that "[t]he narrow definition that other states had accepted was apparently a reaction to the rise of railroad, and other corporations, which apparently put the security of private lands in jeopardy of private condemnation." Buckner F. Melton, Jr., Eminent Domain, "PUBLIC USE," AND THE CONUNDRUM OFORIGINAL INTENT, 36 Nat. Resources J. 59 (Winter 1996), citing, Lawrence M. Friedman, A History of American Law (2d Ed. 1985) at 182. See also,
Friedman at 420, 425 stating that: "[g]enerally speaking, too, the courts (and legislatures) in the years after the Civil War changed their general attitude toward eminent domain doctrines; in the early period . . . doctrines tilted toward the taker of the lands; now more protection tended to go toward the landowner whose lands were taken."
[10] This is a two-part test. In my opinion the fact that property to be built on the land will eventually be accessible by the public is not alone sufficient to establish a "public use." The U.S. Supreme Court inKelo illustrated the difficulty of such a test by referring to language from Dayton Gold Silver Mining Co. v. Seawell, 11 Nev. 394, 410, 1876
WL 4573 (1876) ("If public occupation and enjoyment of the object for which land is to be condemned furnishes the only and true test for the right of eminent domain, then the legislature would certainly have the constitutional authority to condemn the lands of any private citizen for the purpose of building hotels and theatres. Why not? A hotel is used by the public as much as a railroad. The public have the same right, upon payment of a fixed compensation, to seek rest and refreshment at a public inn as they have to travel upon a railroad"). In my opinion the Arkansas Supreme Court has not concluded that public access alone is sufficient to justify the exercise of eminent domain. See Raines, supra.
[11] Although a separate constitutional provision authorizes the taking of property by corporations, including railroads (see Arkansas Constitution, art. 12, § 9), the Arkansas Supreme Court appears to apply a similar "public use" test in cases involving corporate takings and in cases involving taking by public entities. Cf. e.g., Missouri PacificRailroad v. 55 Acres of Land, 947 F.Supp. 1301 (E.D. Ark. 1996) (Reasoner, J.) (citing non-railroad cases in a railroad case); MountainPark Terminal Ry. Co. v. Field, 76 Ark. 239 (1905) (invoking the "public use" test in a railroad case under art. 12, § 9) and Railway Company v.Petty, 57 Ark. 359, 21 S.W. 884 (1893). Cases from each context, therefore, railroad and non-railroad, have thus been cited in both contexts.
[12] There appears to have been at least one aberrant decision that used much broader language. See, Lee Wilson Co. v. Compton Bond Mortgage Co., 103 Ark. 452, 146 S.W. 110 (1912) ("everything which tends to enlarge the resources and promote the productive power of any considerable number of the inhabitants of a section of the State contributes, either directly or indirectly, to the general welfare and the prosperity of the whole community and, therefore, to the public").
[13] It is not at all clear, in my opinion, that the constitutional language recited in Raines is "dictum," especially in light of the way the Raines court framed the issues for resolution: 1) whether the City had been delegated the power of eminent domain; and 2) whether the proposed exercise of the power was a public use satisfying constitutional requirements. Although the court found there was no statutory delegation of eminent domain power to the City, and thus strictly speaking, it would have been unnecessary to address the constitutional issue, the court utilized constitutional principles in determining the scope of the statutes for purposes of the delegation issue. See, e.g., Raines, supra
at 1080-82 ("We recognize that the Act calls for a liberal construction to accomplish the purposes thereof. We do not believe that it was intended that this be the vehicle for overruling all principles of existing law of eminent domain, in view of our recognition that the right of private property is higher than any constitutional sanction." The court also concluded that "we find no delegation to the city of the power of eminent domain by the state under which this taking can be sustained, if indeed the state has any such power in view of the use to which the property would be put. A state cannot grant greater powers . . . than it possesses." These statements illustrate that the court could not give the statute in question the liberal interpretation it self-decreed, because to do so would violate constitutional principles).
[14] The court appeared to cast the issues for resolution as being entirely statutory.
[15] Although the language of the Pfeifer court might be misunderstood as conflating the two, it should be noted that the "necessity" requirement is separate and distinct from the public/private use inquiry. See e.g., Woollard v. Arkansas State Highway Commission,220 Ark. 731, 249 S.W.2d 564 (1952); and Town of Wheatland v. Bellis Farms,Inc., 806 P.2d 281, 290 (Wyo. 1991) (Urbigkit, C.J., dissenting) (stating that: "[n]early all the cases . . . hold that the question of necessity is distinct from the question of public use, and that the former question is exclusively for the legislature. The necessity, expediency or propriety of exercising the power of eminent domain, and the extent and manner of its exercise, are questions of general public policy and belong to the legislative department of the government. They have nothing to do with the question of what constitutes a public use," citing 1 J. Lewis, Eminent Domain § 255 at 502-503 (3d ed. 1909) (footnotes omitted). Seealso, King County v. Farr, 501 P.2d 612 (Wash.App. 1972); Howard RealtyCo. v. Paducah I.R. Co., 182 Ky. 494, 206 S.W. 774 (1918); Arthur v.Board of Commissioners, 43 Okla. 174, 141 P. 1 (1914); City of St. Louisv. Brown, 155 Mo. 545, 56 S.W. 298 (1900); Wisconsin Water Co. v. Winanset al., 85 Wis. 26, 54 N.W. 1003 (1893); and 26 Am. Jur.2d § 27.
[16] Other cases of the Arkansas Supreme Court have sometimes in an offhand manner loosely interchanged the words "public use" and "public purpose" in this context. See e.g., Pfeifer, supra at 460; City of ElDorado v. Kidwell, 236 Ark. 905, 370 S.W. 2d 602 (1963).